UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| *In re*<br>**PECF USS INTERMEDIATE HOLDING II CORP.**[1] Reorganized Debtor. | Case No. 25-23631 (MBK)<br>Chapter 11<br>**Hearing: October 29, 2026, at 10:00 a.m. (ET)** |

# NOTICE OF REORGANIZED DEBTORS' PARTIAL OBJECTION TO CLAIMS #58 AND #63 OF OMJ LLC

[1] The last four digits of Reorganized Debtor PECF USS Intermediate Holding II Corporation's tax identification number are 5368. PECF USS Intermediate Holding II Corporation's chapter 11 case was previously jointly administered under the case of United Site Services, Inc., Case No. 25-23630 (MBK). The location of PECF USS Intermediate Holding II Corporation's service address in this chapter 11 case is: 2487 W Navigator Drive, Ste. 300, Meridian, ID 83642.

**NOTICE IS HEREBY GIVEN** as follows:

A hearing on the *Reorganized Debtor's Partial Objection to Claims #58 and #63 Filed by OMJ LLC* (the "**Objection**") will be held on **October 29, 2026, at 10:00 a.m. (ET)**, or as soon thereafter as counsel may be heard, before the Honorable Michael B. Kaplan, United States Bankruptcy Judge, United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Trenton, NJ 08608 (the "**Court**").

The Objection sets forth the relevant legal and factual bases upon which the relief requested should be granted. A proposed order granting the relief requested in the Objection is also attached to the Objection.

Opposition to the Objection must: (a) be in writing; (b) state with particularity the basis of the opposition; (c) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the District of New Jersey, and (d) be filed with the Court and served so as to be actually received by **October 22, 2026, at 4:00 p.m. (ET)**, by: (i) Milbank LLP, 55 Hudson Yards, New York, NY 10001 (Attn: Dennis F. Dunne, Samuel A. Khalil, Matthew Brod, Lauren C. Doyle, and Benjamin M. Schak), co-counsel for the Reorganized Debtor; and (ii) Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, NJ 07601 (Attn: Michael D. Sirota, Felice R. Yudkin, and Daniel J. Harris), co-counsel for the Reorganized Debtor.

Only those responses that are timely filed, served, and received will be considered at the Hearing. Failure to file a timely response may result in entry of an order granting the relief requested in the Objection.

Unless a response is timely filed and served, the Objection will be decided on the papers and the relief requested may be granted without further notice or hearing.

All documents filed in these Chapter 11 Cases may be obtained free of charge by visiting the website of Verita Global at www.veritaglobal.net/USS. You may also obtain copies of pleadings by visiting the Bankruptcy Court's website at https://www.njb.uscourts.gov/ in accordance with the procedures and fees set forth on that website.

Dated: September 28, 2026

Respectfully submitted,

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone: 1 (201) 489-3000
MSirota@coleschotz.com
FYudkin@coleschotz.com
DHarris@coleschotz.com

- and -

**MILBANK LLP**
Dennis F. Dunne (*pro hac vice*)
Samuel A. Khalil (*pro hac vice*)
Matthew Brod (*pro hac vice*)
Lauren C. Doyle (*pro hac vice*)
Benjamin M. Schak (*pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: 1 (212) 530-5000
DDunne@Milbank.com
SKhalil@Milbank.com
MBrod@Milbank.com
LDoyle@Milbank.com
BSchak@Milbank.com

*Co-Counsel to the Reorganized Debtor*

**MILBANK LLP**
Dennis F. Dunne (admitted *pro hac vice*)
Samuel A. Khalil (admitted *pro hac vice*)
Matthew Brod (admitted *pro hac vice*)
Lauren C. Doyle (admitted *pro hac vice*)
Benjamin M. Schak (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: 1 (212) 530-5000
DDunne@Milbank.com
SKhalil@Milbank.com
MBrod@Milbank.com
LDoyle@Milbank.com
BSchak@Milbank.com

*Co-Counsel to the Reorganized Debtor*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone: 1 (201) 489-3000
MSirota@coleschotz.com
FYudkin@coleschotz.com
DHarris@coleschotz.com

*Co-Counsel to the Reorganized Debtor*

## UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| *In re*<br>**PECF USS INTERMEDIATE HOLDING II CORP.,**[1]<br>Reorganized Debtor. | Case No. 25-23631 (MBK)<br>Chapter 11<br>(Jointly Administered) |

## REORGANIZED DEBTOR'S PARTIAL OBJECTION TO CLAIMS #58 AND #63 OF OMJ LLC

**Please take notice that this Objection seeks to reduce the amount of the Claim #63 from the asserted amount of $1,182,460.64 to an allowed amount of $37,822.78 and to disallow Claim #58 in its entirety. Therefore, please read this notice very carefully and discuss it with your attorney. If you do not have an attorney, you may wish to consult one.**

[1] The last four digits of Reorganized Debtor PECF USS Intermediate Holding II Corporation's tax identification number are 5368. PECF USS Intermediate Holding II Corporation's chapter 11 case was previously jointly administered under the case of United Site Services, Inc., Case No. 25-23630 (MBK). The location of PECF USS Intermediate Holding II Corporation's service address in this chapter 11 case is: 2487 W Navigator Drive, Ste. 300, Meridian, ID 83642.

TO THE HONORABLE MICHAEL B. KAPLAN, UNITED STATES BANKRUPTCY JUDGE:

The above-captioned reorganized debtor (the "**Reorganized Debtor**" and, together with its affiliated reorganized debtors and their successors, as applicable, the "**Reorganized Debtors**" or "**USS**") respectfully states as follows in support of its objection (the "**Objection**") to proof of claim #58 filed on January 27, 2026, by OMJ LLC ("**OMJ**") against United Site Services, Inc. and the substantially similar proof of claim #63 filed on January 28, 2026, by OMJ against United Site Services of Nevada, Inc. (the "**OMJ Claim**").[2]

## RELIEF REQUESTED

1. The Reorganized Debtor seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), allowing the OMJ Claim in the amount of $37,822.78. In support of this Objection, the Reorganized Debtor submits the *Declaration of Adrian Sanchez in Support of Reorganized Debtor's Partial Objection to Claims #58 and #63 of OMJ LLC*, attached hereto as **Exhibit B** (the "**Sanchez Declaration**").

2. The principal statutory bases for the relief requested in this Objection are § 502 of title 11 of the U.S. Code (the "**Bankruptcy Code**"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 3007-1 and 3007-2 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "**Local Rules**"), and § VIII(b) of the Chapter 11 Complex Case Procedures (Dec. 2, 2025) (the "**Complex Case Procedures**").

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this Objection pursuant to 28 U.S.C. § 1334. This case has been referred to the Court pursuant to 28 U.S.C. § 157(a) by the *Standing Order of Reference to the Bankruptcy Court under Title 11* (D.N.J. amended June 6, 2025) (Bumb, C.J.).

[2] These claims appear to be duplicative, differing only in the name of the Debtor against which each is asserted and a spelling error in OMJ's name in claim #63. Since claim #63 appears to name the proper Debtor, the Reorganized Debtor has referred to that claim as the OMJ Claim throughout this Objection. Regardless of the extent to which claim #63 may be allowed, the Reorganized Debtor requests that claim #58 be disallowed in full as duplicative.

This Objection is a core proceeding under 28 U.S.C. § 157(b). The Reorganized Debtor consents to the Court's entry of a final order on this Objection if it is determined that the Court cannot otherwise enter a final order or judgment consistent with Article III of the U.S. Constitution. Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### I. THE CHAPTER 11 CASES

4. On December 29, 2025 (the "**Petition Date**"), each Debtor commenced a case under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**") by filing a voluntary petition for relief. These were prepackaged cases commenced for the purpose of implementing a comprehensive restructuring in accordance with the terms of a restructuring support agreement. The Debtors commenced solicitation of votes on the *Joint Prepackaged Plan of Reorganization of United Site Services, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 16] (as subsequently amended, modified, supplemented, and confirmed, the "**Plan**") reflecting the terms of the restructuring support agreement prior to commencing these Chapter 11 Cases, and filed that Plan of Reorganization on the Petition Date.

5. On February 27, 2026, the Court entered the *Order (I) Approving the Adequacy of the Disclosure Statement and (II) Confirming the Second Amended Joint Prepackaged Plan of Reorganization of United Site Services, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 344]. On March 3, 2026, the Effective Date (as defined in the Plan) occurred. *See Notice of (I) Entry of an Order Approving the Adequacy of the Disclosure Statement and Confirming the Second Amended Joint Prepackaged Plan of Reorganization of United Site Services, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) Occurrence of Effective Date* [Dkt. No. 384] (the "**Confirmation Order**"). On April 16, 2026, the Court entered the *Final Decree Closing Certain of the Chapter 11 Cases* [Dkt. No. 454], closing the Chapter 11 Cases, other than that of PECF USS Intermediate Holding II Corporation. All remaining matters, including administration of claims asserted against each of the Reorganized Debtors, are to be administered in the case of PECF USS Intermediate Holding II Corp.

6. The Plan provides that potential claimants were *not* required to file proofs of claim and that "the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced." Plan, Art. VII.A. Accordingly, many potential claimants did not file proofs of claim at all, and nearly all of the filed proofs of claim have subsequently been disallowed and expunged, with a view to resolving the underlying claims outside the bankruptcy cases—through payment in the ordinary course of business, negotiated settlement, or litigation in a non-bankruptcy forum.

7. Of all claimants in these Chapter 11 Cases, OMJ alone desired to preserve its ability to litigate the OMJ Claim in the Bankruptcy Court rather than a local non-bankruptcy court. For that reason, the Confirmation Order included specific language that was intended to clarify OMJ's ability to do so. *See* Confirmation Order ¶ 127; Audio of Feb. 25, 2026 H'rg, at 3:02-5:59, Dkt. No. 338.

## II. THE OMJ LEASE

8. In 2007, United Site Services of Nevada, Inc. entered into four separate leases (as subsequently replaced, extended and amended, the "**Leases**") of adjoining properties in an industrial section of Clackamas, Oregon (the "**Clackamas Yard**") to operate a storage lot for portable toilet units and other supplies. The leased premises consist of a fenced-in lot, a small office building, two shop buildings, and various smaller structures. The Leases were amended and extended several times, OMJ LLC was substituted as the landlord under all four Leases, and the Leases were ultimately extended to March 31, 2024, at a combined base rent of $23,000 per month. *See* Ex. B-2, Fifth Amdt. to Leases, June 30, 2022.

9. As relevant here, the Leases allocate repair and maintenance obligations to the parties as follows:

> Lessor shall, at [its] cost and expenses, maintain the foundation, structural walls and roof structure (but not the membrane) of the Building in good order and repair. Except as set forth in the preceding sentence, Lessor shall have no obligation to repair,

> maintain and/or replace the Premises, the Building or any component of either. Lessee shall:
>
> 5.1.1 maintain all portions of the Building and the Premises that are not the responsibility of Lessor and all fixtures situated within the Premises in good order and repair;
>
> 5.1.2 maintain, repair and replace, if necessary, all special equipment, and decorative treatments installed by or at Lessee's request and that serve the Premises;
>
> 5.1.3 make all necessary repairs and replacements to all portions of the Building and the Premises; and
>
> 5.1.4 not commit waste to the Premises or any part thereof.

Leases, § 5.1.[3]

10. The Leases do not require USS to surrender the Clackamas Yard in perfect condition. Rather, "Lessee shall surrender the Premises and the Building swept and free of debris, with carpeted areas vacuumed and in good and serviceable condition, subject to ordinary wear and tear." Leases, § 9.1.

11. OMJ has the right to perform USS's obligations on USS's behalf, upon 10 business days' prior written notice, and then to charge USS the cost of performance. *See id.*; Leases, § 16.3 (providing for a 15% administrative charge and 1.5% monthly interest on top of expenditures and costs).

12. Also as relevant here, the Leases provide for the imposition of "holdover" rent under certain limited circumstances:

> [i]f Lessee fails to surrender the Premises and remove all its personal property as set forth herein, Lessor may either: (i) recognize Lessee as a month-to-month Lessee at sufferance and such tenancy shall be subject to all terms of this Lease, except that rent shall be one hundred fifty percent (150%) of the total Rent for the last month being charged and all options or other rights regarding extension of the term or expansion of the Premises shall automatically terminate;

[3] These provisions are substantially identical in each of the Leases, which are each attached to the OMJ Claim. The "Blue Office" Lease is attached to this Objection as Exhibit B-1.

> or (ii) evict Lessee from the Premises and recover all damages resulting from Lessee's wrongful holdover.

Leases, § 9.2.

13. USS's 17 years of occupancy were marked by a generally positive and cooperative relationship with OMJ. USS remained at the premises for eight months beyond the Leases' stated term, conducted various repairs on the property, and paid seven months of regular rent. During that period, USS has no record that OMJ ever requested, and USS never paid, any rent at the 150% "holdover" rate that OMJ now asserts. Instead, OMJ accepted checks for all seven months of rent at the regular rate without protest. During that time, USS and OMJ continued to work constructively to transition the Clackamas Yard back to OMJ. For instance, in October 2024, OMJ's principal asked for a handful of discrete tasks to be completed prior to the handover: paperwork for on-site waste disposal, a full set of keys, general clean-up, removal of a 5-gallon oil container, and fence repairs.

14. Near the end of November 2024, USS removed its personal property and surrendered the Clackamas Yard to OMJ. When USS surrendered the Clackamas Yard to OMJ, the premises (including the Victorian house and other structures) were in fair condition, taking into account ordinary wear and tear during USS's 17-year tenure. USS has not occupied the premises since November 2024. Between that time and the commencement of USS's Chapter 11 Cases, OMJ did not demand or invoice USS for any purported property damage or holdover rent.

15. Consistent with the Leases' terms, USS fully satisfied all taxes and utility charges that fell due prior to the Leases' scheduled expiration. USS understands that certain property taxes and water fees arose between April and November 2024, while USS remained in possession of the Clackamas Yard at OMJ's request. USS is willing to accept liability for a prorated portion of those charges.

## OBJECTION

16. Section 502(a) of the Bankruptcy Code provides, in pertinent part, that: "[a] claim or interest, proof of which is filed under section 501 of [the Bankruptcy Code], is deemed allowed,

unless a party in interest . . . objects." 11 U.S.C. § 502(a). When asserting a claim against a debtor's estate, a claimant must allege facts that, if true, would support a finding that the debtor is legally liable to the claimant. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). To receive the benefit of prima facie validity, however, the proof of claim must "set[] forth facts necessary to support the claim." *In re Stoecker*, 143 B.R. 879, 883 (N.D. Ill. 1992). Where the claimant alleges sufficient facts to support its claim, the claim is afforded prima facie validity. *Allegheny*, 954 F.2d at 173.

17. However, when an objecting party presents evidence to rebut a claim's prima facie validity, the claimant bears the burden of proving the claim's validity by a preponderance of evidence. *See Allegheny*, 954 F.2d at 173–174. The burden of persuasion with respect to the claim is always on the claimant. *Id.* at 174; *Biolite, AG v. Cyganowski* (*In re Biolitec, Inc.*), No. 13-5864 (FSH), 2013 WL 6795400, at *3 (D.N.J. Dec. 16, 2013). In other words, once the prima facie validity of a claim is rebutted, "it is for the claimant to prove his claim, not for the objector to disprove it." *In re Kahn*, 114 B.R. 40, 44 (Bankr. S.D.N.Y. 1990) (citations omitted). Thus, if an objection is filed along with evidentiary support, the court, upon notice and a hearing, must determine the validity and the proper amount of the claim. *See* 11 U.S.C. § 502(b).

18. As summarized in the following chart, the OMJ Claim asserts ten categories of purported damages, few of which have merit. Instead, the OMJ Claim, with its barrage of fees, interest and other charges, appears to be an attempt to extract undue value from a mediocre industrial property.

| **Category** | **Claimed Amount** | **Allowable Amount** |
|---|---:|---:|
| Rent<br>(April 2024 to Nov. 2024) | $115,000.00 | $23,000.00 |
| Rent<br>(Dec. 2024 to August 2025) | $310,500.00 | $0.00 |
| Late fees on rent | $23,575.00 | $2,300.00 |
| Interest on rent | $73,969.55 | $5,375.88 |
| Real property taxes | $17,152.56 | $7,146.90 |
| Water and sanitary sewer fees | $3,067.41 | $0.00 |

| Category | Claimed Amount | Allowable Amount |
|---|---|---|
| "Damages for Assets not being replaced" | $81,000.00 | $0.00 |
| Other "Damages, Repair & Maintenance" | $445,394.45 | $0.00 |
| "Admin Fee at 15% of all DR&M" | $66,809.17 | $0.00 |
| "Interest – other" | $42,675.00 | $0.00 |
| Legal expenses | $3,317.50 | $0.00 |
| **Total** | **$1,182,460.64** | **$37,822.78** |

## I. RENT AND RELATED CHARGES

19. OMJ concedes that USS paid rent at the regular contractual rate of $23,000 for each month from April 2024 to October 2024, when USS actually occupied the Clackamas Yard. *See* OMJ Claim at 6; Ex. B-2, Fifth Amdt. at ¶ 2. But OMJ wants more.

20. *First*, OMJ seeks an extra $11,500 per month for each of those months, beyond that regular rent that OMJ consistently accepted during that period. However, the parties' course of conduct demonstrates that OMJ and USS intended to continue the Leases from month to month at the usual rate.[4] From that point on, USS consistently paid OMJ by check at the usual rate, and OMJ accepted each of those checks without complaint. And no wonder. USS's remediation work was performed for OMJ's benefit, and OMJ appeared to have no replacement tenant in the offing for its small industrial lot. If OMJ had demanded a 50% rent increase just so USS could improve OMJ's own property, USS undoubtedly would have refused, and OMJ would have been left to remediate the Clackamas Yard itself. In reality, OMJ did not expect holdover rent after the end of the Leases' stated term, and concocted such a demand only after USS had already surrendered the premises.

21. USS's extended month-to-month tenancy is nothing like the holdover situation contemplated by the Leases. The Leases provide that an increased rent rate of 150% becomes

[4] USS concedes that it owes $23,000 in ordinary base rent for November 2024.

payable "[i]f Lessee fails to surrender the Premises and remove all its personal property as set forth herein . . . ." Leases at § 9.2. Thus, the Leases anticipated a situation in which OMJ desired USS to "surrender the Premises and remove all its personal property" and USS "fail[ed]" to do so. To the contrary, both OMJ and USS (who enjoyed an amicable relationship, *see* OMJ Claim at 14 (referring to a "long history of good and productive cooperation")) understood that USS would remain in possession at the usual rate to perform remedial work on the premises.

22. Courts have often rejected landlords' attempts to impose holdover rent retroactively, after accepting rent at a standard rate on a month-to-month basis. *See, e.g.*, *Ultimate Salon & Spa, Inc. v. Legends Constr. Grp.*, 2019-Ohio-2506 ¶ 38 (Ohio App. 2019) (denying enforcement of holdover rent "due to the length of time that passed while [the landlord] accepted the continuing rent without objection" during which "an implied contract arose"); *EAC Props., LLC v. Brightwell*, 2011-Ohio-2373 ¶¶ 25-29 (Ohio App. 2011) (affirming finding that landlord waived holdover rent by accepting 13 checks at standard rate); *Kings Row Ctrs., LLC v. Town House Cigar, Inc.*, Case No. 23-198351-CB, 2024 Mich. Cir. LEXIS 371 (Mich. Cir. Ct. May 9, 2024) (finding that landlord waiver holdover rent by accepting payment at standard rate for two years); *Renaissance Dev. Corp. v. Airport Valet, Inc.*, C.A. No. KD 2011-1208, 2013 R.I. Super. LEXIS 201 (R.I. Super. Dec. 2, 2013) (finding that landlord waived holdover rent by accepting a single check at standard rate, even when landlord demanded payment at holdover rate ***three days*** after expiration of lease).

23. <u>*Second*</u>, OMJ seeks $34,500 per month for an extra 10 months *after* USS unambiguously surrendered the Clackamas Yard. *See* OMJ Claim at 6 (chart of asserted rent claims, and notation that OMJ was informed, no later than late November 2024, that "USS was no longer in the property" and "USS was done with the property effectively sur[r]endering property back to OMJ"). The Leases themselves state that holdover rent is payable only if USS "fails to surrender the Premises and remove its personal property." But OMJ admits that USS surrendered the Clackamas Yard no later than November 2024, and the OMJ Claim does not assert that any personal property of USS remained on site after that time. OMJ's own proof of claim shows that

OMJ re-entered the Clackamas Yard to perform substantial amounts of unspecified work as early as October 2024. *See* OMJ Claim at 10.

24. Instead of basing this additional holdover claim on either of the contractual hooks (failure to surrender or failure to remove personal property), OMJ instead asserts holdover rent for the time "while OMJ repaired USS property damages not performed as required in the lease before surrendering property back to OMJ." OMJ Claim at 6. This novel extra-contractual theory assumes that holdover rent can be charged for OMJ's own possession of the property simply because USS surrendered the premises in deficient condition.

25. Even assuming OMJ's allegations to be true, OMJ's proper remedy is to charge USS for the actual expenses of remediation, along with a contractual administrative charge of 15%. *See* Leases, § 16.3. The parties negotiated that administrative charge on top of actual remediation costs, presumably to cover indirect costs, such as overhead and the loss of use of the premises. Where the parties have agreed on a fixed remedy for a failure to maintain the premises, the Court should not impose hundreds of thousands of dollars of additional damages under the guise of holdover rent for a period when OMJ held sole possession of the Clackamas Yard. Moreover, as set forth below, USS surrendered the Clackamas Yard in substantially the condition required by the Leases.

26. Finally, OMJ demands $23,575 in late fees and $73,970 in interest on top of the alleged holdover rent obligations. USS concedes that rent for July 2024 was paid one month late, giving rise to a 5% fee ($1,150) and 1.5% interest ($345) for that month's rent. USS also concedes that rent for November 2024 was not paid, giving rise to a 5% fee ($1,150) and 1.5% monthly interest for approximately 13 months through the Petition Date ($5,030.88). Other than those amounts, no late fees or interest can be due on holdover rent that was not payable. Furthermore, any interest that could have accrued after the Petition Date is specifically disallowed by § 502(b)(2) of the Bankruptcy Code (providing that claims are allowable "except to the extent that . . . such claim is for unmatured interest").

## II. Taxes and Fees

27. OMJ apparently concedes that USS paid all taxes and similar fees that fell due prior to the end of the Leases' stated term. However, OMJ has asserted claims for (a) $17,152.56 in Clackamas County property taxes for the 12-month period from July 2024 to June 2025, (b) $2,728.95 in "Clackamas County Surface Water & Sanitary Sewer Fees" as of April 1, 2025, and (c) $338.46 in "Clackamas River Water" charges, as of February 28, 2025. USS accepts liability for $7,146.90 in property taxes, for the five months of USS's occupancy during the 12-month tax period (i.e., July to November 2024). However, OMJ carries the burden of proving that the water fees pertain to USS's occupancy. In fact, the OMJ Claim states balances for water and sewer fees as of a date that is well after USS surrendered the premises. USS is not liable for these charges unless OMJ establishes that they relate to USS's term of occupancy.

## III. Property Damage

### A. "Assets Not Being Replaced"

28. The OMJ Claim asserts $81,000 in "Damages for Assets not being replaced." This apparently refers to two structures (a "conference building" and a "cover between containers") that, OMJ asserts, were damaged beyond repair or were otherwise not worth the cost of replacing.

29. OMJ assesses $61,000 for the conference building, based on an "est[imate]" of the "original builder." OMJ Claim at 6. This "estimate" appears to be for the cost of rebuilding a ***new*** conference building from scratch. But that is not the standard that the Leases specify. The Leases allow for "ordinary wear and tear" of property at the Clackamas Yard. During USS's 17 years of possession, one would expect a substantial amount of wear and tear on a small, cheaply built conference trailer. At most, OMJ is entitled to an amount that appropriately accounts for the depreciation of the assets over USS's 17 years of use.

30. Similarly, for the "Cover between Containers" (assessed by OMJ at $20,000 "per online research"), OMJ is entitled, at most, to a valuation that reflects 17 years of ordinary wear and tear. Moreover, unspecified "online research" cannot form the basis of a valuation, especially when materials received from OMJ suggest that the "online research" consisted of nothing more

than a single question to a Google AI system. *See* Ex. C; *see also* Paul W. Grimm et al., *Artificial Intelligence as Evidence*, 19 Nw. J. Tech. & Intell. Prop. 9, 86-96 (2021) (summarizing obstacles to introduction of raw AI output under Federal Rules of Evidence). Whatever validity OMJ's claim may have, OMJ carries the burden of proving both liability and damages through competent evidence.

**B. Damages, Repair & Maintenance**

31. The OMJ Claim asserts three categories of other damage-related claims, each tracing back to USS's obligation under § 9.1 of the Leases to surrender the premises "in good and serviceable condition, subject to ordinary wear and tear": (1) "Receipts" in the amount of $178,568.46, apparently referring to actual expenditures through the filing of the OMJ Claim, (2) "To Go Expenditures" in the amount of $121,895.99, apparently referring to estimated future expenditures, and (3) "Labor" in the amount of $144,930, calculated as 1,932.40 hours at a rate of $75 per hour.

32. As with the conference building and the "cover between containers" described above, each of these categories should be disallowed because the OMJ Claim does not provide any allowance for "ordinary wear and tear." After 17 years at a heavily used industrial site, it should come as no surprise that some asphalt may be cracking and some paint peeling. A proper claim for remediation would need to prove that the actual condition of the property's gravel, fencing, asphalt, and offices is worse than the expected conditions of those items after 17 years of heavy use.

33. Aside from the general failure by OMJ to plead damages under § 9.1 of the Leases, several components of the OMJ Claim fail for more specific reasons:

- Asphalt repair estimate of $15,000 is sourced from "Best est[imate] from online research" (again, apparently a Google AI query) rather than specific bids received or evidence of the local market.
- "Disposal Site Design & Op manuals" is a vague category that bears no apparent relation to USS's obligations under the Leases. Furthermore, the source of the $20,000 estimate is nothing more than "my Est[imate]"—i.e., the personal guess of OMJ's owner.
- No basis is given for the assessment of "Labor" charges or the $75/hour cost of "Labor." To the extent this category refers to physical laborers hired directly by OMJ, the cost

appears wildly out of line with ordinary hourly wages. *Cf.* Bur. of Labor Stats., Occupational Employment and Wages, Construction Laborers (May 2023), available at https://www.bls.gov/oes/2023/may/oes472061.htm. To the extent this category refers to OMJ's general overhead expenses or the "labor" of OMJ's sole owner, it should be disallowed entirely, as being duplicative of the 15% administrative fee already charged under the Leases.

34. Even if some remediation costs may be allowable, OMJ carries the burden of demonstrating the actual condition of the Clackamas Yard upon its surrender, the actual condition 17 years earlier, the degree of reasonable wear and tear, and OMJ's reasonable remediation expenses.

### C. Administrative Fee and Interest

35. USS does not contest that a 15% administrative fee may be charged on any damages that are due on account of a proven failure to surrender the property in the condition specified in the Leases. Because any provable OMJ's damages are far less than the $445,394 asserted by OMJ, the administrative fee should be commensurably far less than $66,809.

36. Similarly, USS concedes that interest may accrue at the contractual rate on OMJ's actual costs, but expects that the total amount of interest is far less than OMJ's estimate. Moreover, as explained above, interest stopped accruing on the Petition Date by operation of § 502(b)(2) of the Bankruptcy Code.

## IV. Legal Fees

37. Legal fees should not be allowed, because the Leases permit an award of only those attorney's fees and costs that "result[ed] from" "suit . . . to enforce any provisions of this Lease." Leases, § 22.1. USS reserves all rights as to attorney's fees, including to seek an award of USS's own fees if USS is the prevailing party in this matter. *See* Leases § 22.1.

## V. Duplicative Claims

38. As explained above, at footnote 2, proof of claim #58 is duplicative of the OMJ Claim and should be disallowed on that basis. To the extent that proof of claim #58 is not

disallowed as duplicative, every aspect of this objection to the OMJ Claim (proof of claim #63) is incorporated as against proof of claim #58.

## RESERVATION OF RIGHTS

39. The Reorganized Debtor reserves its rights to amend, modify, or supplement the objection asserted herein and to file additional objections to the OMJ Claim on any basis.

40. Nothing contained herein or any actions taken pursuant to such relief is intended or should be construed as: (a) an admission as to the validity of any prepetition claim against a Reorganized Debtor entity or such Reorganized Debtor entity's estate (other than the OMJ Claim in the amount of $37,822.78); (b) a waiver of any party's right to dispute any prepetition claim on any grounds, including jurisdictional, procedural, time-based, and merits-based grounds; (c) a promise or requirement to pay any prepetition claim (other than the OMJ Claim in the amount of $37,822.78); (d) an implication or admission that any particular claim is of a type specified or defined in this Objection or any order granting the relief requested by this Objection; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to § 365 of the Bankruptcy Code; or (f) a waiver of the Reorganized Debtors' rights under the Bankruptcy Code or any other applicable law.

## NOTICE

41. Notice of this Objection will be provided to persons listed in paragraph 94 of the Confirmation Order, including OMJ. The Reorganized Debtor respectfully submits that no further notice is required.

Upon the foregoing Objection, the Reorganized Debtor respectfully requests that the Court (a) enter an order, substantially in the form attached to the Objection as **Exhibit A**, granting the Objection, and (b) grant such other relief as is just and proper.

Dated: September 28, 2026

Respectfully submitted,

*/s/ Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone: 1 (201) 489-3000
MSirota@coleschotz.com
FYudkin@coleschotz.com
DHarris@coleschotz.com

- and -

**MILBANK LLP**
Dennis F. Dunne (admitted *pro hac vice*)
Samuel A. Khalil (admitted *pro hac vice*)
Matthew Brod (admitted *pro hac vice*)
Lauren C. Doyle (admitted *pro hac vice*)
Benjamin M. Schak (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: 1 (212) 530-5000
DDunne@Milbank.com
SKhalil@Milbank.com
MBrod@Milbank.com
LDoyle@Milbank.com
BSchak@Milbank.com

*Co-Counsel to the Reorganized Debtor*

**EXHIBIT A TO OBJECTION**

**PROPOSED ORDER**

| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
|---|---|
| *In re*<br>**PECF USS INTERMEDIATE HOLDING II CORP.**[1] Reorganized Debtor. | Case No. 25-23631 (MBK)<br>Chapter 11<br>(Jointly Administered)<br>**Related to Dkt. No. _____** |

# ORDER SUSTAINING REORGANIZED DEBTOR'S PARTIAL OBJECTION TO CLAIMS #58 AND #63 OF OMJ LLC

The relief set forth on the following pages, numbered (3) through (4), is **ORDERED**.

[1] The last four digits of Reorganized Debtor PECF USS Intermediate Holding II Corporation's tax identification number are 5368. PECF USS Intermediate Holding II Corporation's chapter 11 case was previously jointly administered under the case of United Site Services, Inc., Case No. 25-23630 (MBK). The location of PECF USS Intermediate Holding II Corporation's service address in this chapter 11 case is: 2487 W Navigator Drive, Ste. 300, Meridian, ID 83642.

**Caption in compliance with D.N.J. LBR 9004-1(b)**

**MILBANK LLP**
Dennis F. Dunne (admitted *pro hac vice*)
Samuel A. Khalil (admitted *pro hac vice*)
Matthew Brod (admitted *pro hac vice*)
Lauren C. Doyle (admitted *pro hac vice*)
Benjamin M. Schak (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: 1 (212) 530-5000
DDunne@Milbank.com
SKhalil@Milbank.com
MBrod@Milbank.com
LDoyle@Milbank.com
BSchak@Milbank.com

- and -

**COLE SCHOTZ P.C.**
Michael D. Sirota
Felice R. Yudkin
Daniel J. Harris
Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone: 1 (201) 489-3000
MSirota@coleschotz.com
FYudkin@coleschotz.com
DHarris@coleschotz.com

*Co-Counsel to the Reorganized Debtor*

Upon the objection (the "**Objection**")[1] of the above-captioned reorganized debtor (the "**Reorganized Debtor**") for entry of an order (this "**Order**") (a) disallowing as duplicative claim #58 and (b) reducing and allowing claim #63 (the "**OMJ Claim**") in the amount of $37,822.78; and the Court having jurisdiction to decide the Objection and to enter this Order pursuant to 28 U.S.C. § 1334; and the Chapter 11 Cases having been referred to this Court by standing order of the U.S. District Court for the District of New Jersey; and consideration of the Objection being a core proceeding pursuant to 28 U.S.C. § 157(b) upon which this Court may enter a final order consistent with Article III of the U.S. Constitution; and venue being proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Objection having been provided, such that no other or further notice is required or necessary under the circumstances; and the Court having determined that the legal and factual bases set forth in the Objection, the Sanchez Declaration, and the record establish just cause for entry of this Order; it is hereby **ORDERED** that:

1. The Objection is **SUSTAINED** as set forth herein.

2. The OMJ Claim is hereby allowed as a non-priority unsecured claim in the amount of $37,822.78.

3. Claim #58 is hereby disallowed for all purposes in these Chapter 11 Cases.

4. Notice of the Objection as described therein is deemed good and sufficient notice of the Objection and the relief requested therein, and the requirements of Bankruptcy Rules and the Local Rules are satisfied by such notice.

5. Notwithstanding any provision of the Bankruptcy Rules or Local Rules, this Order shall be effective and enforceable immediately upon its entry.

6. The Reorganized Debtor and its agents are authorized to take all steps necessary or appropriate to carry out this Order.

[1] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Objection.

7. The Court retains jurisdiction over all matters arising from or related to the implementation, interpretation or enforcement of this Order.

# EXHIBIT B TO OBJECTION

## SANCHEZ DECLARATION

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| *In re*<br>**PECF USS INTERMEDIATE HOLDING II CORP.** [1]Reorganized Debtor. | Case No. 25-23631 (MBK)<br>Chapter 11<br>(Jointly Administered) |

## DECLARATION OF ADRIAN SANCHEZ REGARDING CLAIMS #58 AND #63 OF OMJ LLC

Under 28 U.S.C. § 1746, I, Adrian Sanchez, declare as follows under penalty of perjury:

1. I am a Vice President of Operations of Reorganized Debtor United Site Services, Inc. (collectively, with its affiliated reorganized debtors, the "**Reorganized Debtors**" or "**USS**"). I have served in this role since September 2023. I oversee operations for USS's West region, which encompasses California, Arizona, Nevada, Oregon, Washington, Idaho, Utah, Wyoming, and Colorado. I work with the USS sales, safety, and finance departments on a regular basis. Prior to joining USS, I worked for large organizations, both private and public, directing operations and transportation departments. I hold a Bachelor of Science degree in International Business from the University of Phoenix, School of Business.

2. I submit this declaration on behalf of USS regarding proof of claim #58 and proof of claim #63 (the "**OMJ Claim**") filed by OMJ LLC ("**OMJ**").

3. In 2007, United Site Services of Nevada, Inc. entered into four separate leases (as subsequently replaced, extended and amended, the "**Leases**") of adjoining properties in an industrial section of Clackamas, Oregon (the "**Clackamas Yard**") to operate a storage lot for portable toilet units and other supplies. The leased premises consist of a fenced-in lot, a small office

[1] The last four digits of Reorganized Debtor PECF USS Intermediate Holding II Corporation's tax identification number are 5368. PECF USS Intermediate Holding II Corporation's chapter 11 case was previously jointly administered under the case of United Site Services, Inc., Case No. 25-23630 (MBK). The location of PECF USS Intermediate Holding II Corporation's service address in this chapter 11 case is: 2487 W Navigator Drive, Ste. 300, Meridian, ID 83642.

building, two shop buildings, and various smaller structures. The Leases were amended and extended several times, OMJ was substituted as the landlord under all four Leases, and the Leases were ultimately extended to March 31, 2024, at a combined base rent of $23,000 per month.

4. USS's 17 years of occupancy were marked by a generally positive and cooperative relationship with OMJ. USS remained at the premises for eight months beyond the Leases' stated term, conducted various repairs on the property, and paid seven months of regular rent. During that period, USS has no record that OMJ ever requested, and USS never paid, any rent at the 150% "holdover" rate that OMJ now asserts. Instead, OMJ accepted checks for all seven months of rent at the regular rate without protest. During that time, USS and OMJ continued to work constructively to transition the Clackamas Yard back to OMJ. For instance, in October 2024, OMJ's principal asked for a handful of discrete tasks to be completed prior to the handover: paperwork for on-site waste disposal, a full set of keys, general clean-up, removal of a 5-gallon oil container, and fence repairs.

5. Near the end of November 2024, USS removed its personal property and surrendered the Clackamas Yard to OMJ. When USS surrendered the Clackamas Yard to OMJ, the premises (including the Victorian house and other structures) were in fair condition, taking into account ordinary wear and tear during USS's 17-year tenure. USS has not occupied the premises since November 2024. Between that time and the commencement of USS's Chapter 11 Cases, OMJ did not demand or invoice USS for any purported property damage or holdover rent.

6. Consistent with the Leases' terms, USS fully satisfied all taxes and utility charges that fell due prior to the Leases' scheduled expiration.

7. For the foregoing reasons, I believe that the claims filed by OMJ are substantially meritless and should be disallowed, except as acknowledged in USS's objection.

8. True and fair copies of (a) the "Blue Office" Lease and (b) the fifth amendment to each of the Leases are attached to this Declaration as **Exhibits B-1** and **B-2**. The three Leases other than the "Blue Office" Lease are attached to the OMJ Claim and are substantially similar to the "Blue Office" Lease in relevant respects.

Dated: September 28, 2026

____________________________
Adrian Sanchez

# EXHIBIT B-1 TO OBJECTION

## "BLUE OFFICE" LEASE

# LEASE

**PARTIES**. This is a Lease between Blue Office, LLC, an Oregon limited liability company with an address at c/o Cliff Porter, 1865 SW 13th Court, Gresham, Oregon 97030 (hereinafter called the "Lessor"), and United Site Services of Nevada, Inc., a Nevada corporation (hereinafter called the "Lessee").

## SECTION 1. PREMISES.

1.1 Lease of Premises. Lessor hereby leases to Lessee and Lessee hereby hires from Lessor, upon the terms and conditions herein set forth, certain real property, including any structures thereon, at 12211 SE Highway 212, Clackamas, Oregon 97015, more particularly described in Exhibit "A" attached hereto (hereinafter called the "Premises").

1.2 Delivery of Possession and Commencement. Lessor shall deliver the Premises to Lessee in good condition and repair. Lessee acknowledges that Lessee accepts the Premises "As-is, Where-is" and as suitable for Lessee's intended use, in good and sanitary operating condition and repair, and without any other representation or warranty by Lessor as to the condition, use or occupancy.

## SECTION 2. TERM.

2.1 Term. The term of this Lease shall commence on the date hereof (the "Commencement Date"). The initial term of this Lease shall be for sixty (60) consecutive months, commencing on the Commencement Date (the "Term").

2.2 Option to Extend Term. So long as Lessee is not in default under this Lease beyond the applicable cure period, if any, at the time of exercise, Lessor hereby grants Lessee two (2) options to extend the initial term of this Lease for an additional period of sixty (60) months each (the "Option Periods") on the same terms, covenants and conditions of this Lease, except that rent shall be determined in accordance with paragraph 3.2 below. Lessee shall exercise each option, if at all, by giving Lessor written notice (the "Option Notice") at least one hundred eighty (180) days prior to the expiration of the Term or the immediately preceding Option Period of this Lease.

## SECTION 3. RENT.

3.1 Base Rent. Lessee agrees to pay to Lessor Base Rent at the rate of $3,000.00 per month, payable in advance on the first day of each month during the Term.

3.2 Option Rent. If Lessee has duly exercised its option to extend the Term for the first Option Period, then on the first (1st) day of such Option Period (the "First Option Commencement Date") and each annual return of the First Option Commencement Date, Base Rent shall be increased as set forth herein. If Lessee has duly exercised its option to extend the Term for a second Option Period, on the first (1st) day of such second Option Period (the "Second Option Commencement Date") and each annual return of the Second Option Commencement Date, Base Rent shall be increased as set forth herein. Each date wherein Base Rent shall be subject to increase is referred to as an "Adjustment Date." On each Adjustment

Date, Base Rent shall be increased to reflect the increase, if any, in the Consumer Price Index (the "CPI" and as hereinafter defined) between the Adjustment Date and the date on which Base Rent was last adjusted (the "Comparison Date"). For the purpose of adjusting Base Rent on the First Option Commencement Date, the Comparison Date shall be the last day of the fourth (4th) year of the Term of the Lease. On each Adjustment Date, the Base Rent then in effect shall be increased, but not decreased, by multiplying such Base Rent by a fraction, the numerator of which is the CPI published most recently before the applicable Adjustment Date, and the denominator of which is the CPI published most recently before the Comparison Date. In no event shall the Base Rent on any Adjustment Date be less than the Base Rent on the day immediately preceding such Adjustment Date.

For purposes hereof, Consumer Price Index shall be the Consumer Price Index – All Items (1982 - 84 = 100) For All Urban Consumers, Portland-Vancouver Metropolitan Area, issued by the Bureau of Labor Statistics of the U.S. Department of Labor. If the CPI is discontinued during the Term, a comparable successor index reasonably acceptable to Lessor shall be used.

3.3 Rent. Lessee shall pay to Lessor all Rent for the Premises without demand, deduction or offset. The term "Rent" as used in this Lease shall include Base Rent, Additional Rent (as hereinafter defined) and all other sums due under the Lease. Rent for any partial calendar month shall be prorated based on a thirty (30)-day month for the number of days during that partial month the Premises are occupied by Lessee.

3.4 Additional Rent. The term "Additional Rent" means any other sums payable by Lessee to Lessor under this Lease.

3.5 Lease Year. The term "Lease Year" shall mean each calendar year of the Term. In the event the Commencement Date occurs or the Lease expires or terminates on any date other than the first day of the calendar year, the calculations, costs and payments referred to herein shall be prorated for such calendar year.

3.6 Late Charge; Interest. Rent not paid when due shall bear interest until paid at the lesser of (i) the rate of one and one half percent (1½%)per month, or (ii) the maximum rate of interest then permitted by law. Lessor may impose a late charge of the greater of (a) five percent (5%) of Rent then due or (b) $50 for each payment of Rent made more than ten (10) days late (the "Late Charge"). Lessee agrees that late payment by Lessee to Lessor of any Rent or other sums due hereunder will cause Lessor to incur costs not contemplated by this Lease, that the exact amount of such costs are extremely difficult and impracticable to ascertain, and that the Late Charge is not a penalty but represents a fair and reasonable estimate of the costs that Lessor will incur by reason of any such late payment. The imposition or collection or failure to impose or collect such a Late Charge shall not be deemed a waiver by Lessor of any other remedies available for Lessee's default of this Lease. In addition to the Late Charge, Lessee shall pay Lessor an additional charge of $75 for any checks returned due to insufficient funds.

3.7 Disputes. If Lessee disputes any charge for Additional Rent or any Rent adjustment under this Section 3, Lessee shall give notice to Lessor not later than thirty (30) days after receipt of the notice from Lessor describing the charge or adjustment in question. If Lessee

fails to give such notice to Lessor, the charge or adjustment by Lessor shall be conclusive and binding on Lessee. If Lessee delivers timely notice, the challenged charge or adjustment shall be conclusively resolved by an independent certified public accountant selected by the parties. Each party shall pay one half (½) of the fee charged by the accountant selected to decide the matter, except that if the adjustment in favor of Lessee does not exceed five percent (5%) of the challenged amounts, Lessee shall pay (a) the entire cost of the accountant's fee; and (b) all reasonable out of pocket costs and expenses incurred by Lessor in responding to the challenge. In the alternative, if the adjustment in favor of Lessee is equal to or exceeds five percent (5%) of the challenged amounts, Lessor shall pay (i) the entire cost of the accountant's fee, and (ii) all reasonable out-of-pocket costs and expenses incurred by Lessee in challenging such charge or adjustment. Nothing herein shall be deemed to alter any other obligations of Lessee as required by this Lease.

**SECTION 4. TAXES AND INSURANCE.**

4.1 Taxes. Lessee shall pay before delinquency all Taxes, assessments, licenses, fees and charges assessed, imposed or levied on (a) Lessee's business operations, (b) all trade fixtures, (c) any leasehold improvements, (d) merchandise and (e) other personal property in or about the Premises. Within ten (10) days of payment of such Taxes, Lessee shall deliver a written receipt from the taxing authority confirming such payment. The term "Taxes" shall include (i) all real and personal property taxes, charges, rates, duties and assessments (including local improvement district assessments) levied or imposed by any governmental authority with respect to the Premises and any improvement, fixtures and equipment located therein or thereon, and with respect to all other property of Lessee, real or personal, located in or on the Premises and used in connection with the operation of the Premises; (ii) any tax in lieu of or in addition to, or in connection with the operation of the Premises or any improvement thereon; (iii) any tax in lieu of or in addition to, or a substitution of a real property tax; and (iv) any tax or excise levied or assessed by any governmental authority on the Rent payable under this Lease or Rent accruing from use of the Premises, providing that this shall not include federal or state, corporate or personal income taxes. Lessee may contest by any lawful proceedings, in Lessee's or Lessor's name, any such Taxes. Lessor shall reasonably cooperate with Lessee and execute any documents reasonably requested by Lessee for such purpose, but Lessor shall not be required to incur any expense in providing such cooperation and Lessee shall indemnify and hold Lessor harmless from and against any detriment or damage incurred by Lessor arising out of or resulting from any such Tax contest. Taxes for any tax period in which the Term shall commence or expire shall be apportioned based on the number of days of such tax period in the Term of this Lease or any Option Period.

4.2 Insurance. Lessee shall obtain comprehensive general liability insurance applying to the use and occupancy of the Premises with limits of not less than Two Million Dollars ($2,000,000) combined single limit bodily injury and property damage. Such liability insurance shall include an endorsement naming Lessor, any lender and Lessor's managing agent, if any, as additional insureds, shall insure the liability of Lessee under Section 12 of this Lease, and be in form and with companies with a Best's rating of not less than A-. Within fifteen (15) days of the Commencement Date, Lessee shall deliver to Lessor a certificate evidencing such insurance and that shall require no less than thirty (30) days' prior written notice to Lessor prior to any cancellation or material change to such insurance. No later than thirty (30) days' prior to

expiration of any policy, Lessee shall deliver a renewal certificate to Lessor for such insurance policy. Lessee may maintain the required liability insurance in the form of a blanket policy covering other locations of Lessee in addition to the Premises; provided, however, that Lessee shall provide Lessor with a certificate of insurance specifically naming the location of the Premises and naming Lessor as an additional insured as required in this Section, the limits of which coverage are to be in the amounts set forth in this Section. Lessee shall not have the right to self-insure any insurance coverage required of Lessee under this Lease.

**SECTION 5. REPAIRS AND MAINTENANCE; ENVIRONMENTAL CONDITIONS.**

5.1 Repairs and Maintenance. Lessor shall, at Landlord's cost and expense, maintain the foundation, structural walls and roof structure (but not the membrane) of the Building in good order and repair. Except as set forth in the preceding sentence, Lessor shall have no obligation to repair, maintain and/or replace the Premises, the Building or any component of either. Lessee shall:

5.1.1 maintain all portions of the Building and the Premises that are not the responsibility of Lessor and all fixtures situated within the Premises in good order and repair;

5.1.2 maintain, repair and replace, if necessary, all special equipment, and decorative treatments installed by or at Lessee's request and that serve the Premises;

5.1.3 make all necessary repairs and replacements to all portions of the Building and the Premises; and

5.1.4 not commit waste to the Premises or any part thereof. If Lessee fails to perform Lessee's obligations under this Section or under any other Section of this Lease, after ten (10) business days' prior written notice to Lessee, except in an emergency when no notice shall be required, Lessor may enter upon the Premises, perform the obligations on Lessee's behalf, and recover the cost of performance, together with interest at the rate of one and one-half percent (1½%) per month, as Additional Rent payable by Lessee with the next installment of Rent, provided that in the event such rate exceeds the maximum rate then allowed by law, the interest rate shall be such maximum rate allowed by law.

5.2 Environmental Condition. Neither Lessee nor Lessee's agents or employees shall cause or permit any Hazardous Material, as hereinafter defined, to be brought upon, stored, used, generated, released into the environment, or disposed of on, in, under, or about the Premises and Building, except reasonable quantities of cleaning supplies and office supplies necessary to or required as part of Lessee's business that are generated, used, kept, stored, or disposed of in a manner that complies with all Laws regulating any such Hazardous Materials and with good business practices. Lessee covenants to remove from the Premises and the Building, upon the expiration or sooner termination of this Lease and at Lessee's sole cost and expense, any and all Hazardous Materials brought upon, stored, used, generated, or released into the environment during the term of this Lease. The preceding sentence shall not apply to Hazardous Materials that migrate on or under the Premises from sources located off the Premises. As to such migrating Hazardous Materials, the parties shall have such obligations as they may otherwise have under applicable law. Lessee shall promptly notify Lessor of any release of Hazardous

Materials in, on, or about the Premises or the Building that Lessee, or Lessee's agents or employees, becomes aware of during the Term of this Lease, whether caused by Lessee, Lessee's agents or employees, or any other persons or entities.

5.2.1 To the fullest extent permitted by Law, Lessee hereby agrees to indemnify, defend, protect, and hold harmless Lessor, Lessor's managing agent and their respective agents and employees, and their respective successors and assigns, from any and all claims, judgments, damages, penalties, fines, costs, liabilities, and losses that arise during or after the term directly or indirectly from the use, storage, disposal, release or presence of Hazardous Materials by Lessee, its agents, employees or invitees on, in, or about the Premises and the Building which occurs during the term of this Lease.

5.2.2 To the fullest extent permitted by law, Lessor hereby agrees to indemnify, defend, protect and hold harmless Lessee, and its agents and employees and its respective successors and assigns, from any and all claims, judgments, damages, penalties, fines, costs, liabilities and losses that arise during or after the term directly or indirectly from the use, storage, disposal, release or presence of Hazardous Materials by Lessor, its agents, employees, or contractors on, in or about the Premises and the Building.

5.2.3 As used herein, the term "Hazardous Material" means any hazardous or toxic substance, material, or waste which is or becomes regulated by any local governmental authority, the state of Oregon or the United States government. The term "Hazardous Material" includes, without limitation, any material or substance that is (i) defined as a "hazardous waste," "extremely hazardous waste," "restricted hazardous waste," "hazardous substance," "hazardous material," or "waste" under any federal, state or local law, (ii) petroleum, and (iii) asbestos. The provisions of this Section 5, including, without limitation, the indemnification provisions set forth herein, shall survive any termination of this Lease.

**SECTION 6. USE.**

6.1 Permitted Use. Lessee shall use the Building, Premises and all appurtenant rights thereto for the renting, servicing and storage of portable restroom and sanitation facilities, and other equipment, including outdoor storage of portable restrooms and vehicles and related activities only (the "Permitted Use") and for no other purpose or in any other manner without the prior written consent of Lessor. Lessor shall not unreasonably withhold its consent to any such use so long as such use is not contrary to any applicable law or regulation, a nuisance or offensive or which could cause injury or damage to the Premises. If Lessee is prevented from using the Premises for the renting, servicing and storage of portable restroom and sanitation facilities, and other equipment, including outdoor storage of portable restrooms and vehicles, as a result of the enforcement by any governmental entity with jurisdiction of any zoning or land use laws, regulations or ordinances, then Lessee may, by delivery of sixty (60) days prior written notice to Lessor, elect to terminate this Lease and thereafter, other than obligations that have accrued but are unperformed as of the date of such termination, neither Lessor nor Lessee shall have any further obligations hereunder.

6.2 Compliance with Laws. As of the Commencement Date, Lessee shall at its expense promptly comply and cause the Premises to comply with all applicable laws, statutes,

ordinances, rules and regulations of any public authority (the "Laws") applicable to the Premises and the Permitted Use. Notwithstanding the foregoing, if (i) any alteration of the Premises is required in order to comply with the Americans with Disabilities Act, and (ii) the cost of such alterations is less than $30,000, then Lessor shall, at its expense, make such alteration, and the amount of such cost shall be amortized over the remaining term and extension periods as reasonably determined by Lessor and monthly Base Rent shall be increased by such amortized amount. If the cost of the required alteration is more than $30,000, Lessor and Lessee shall negotiate, in good faith, to allocate such cost between them. If the parties are unable to agree on the allocation of such cost, then either party may elect to terminate the Lease by delivering ninety (90) days advance written notice to the other party, and thereafter, other than obligations that have accrued but are unperformed as of the date of such termination, neither Lessor nor Lessee shall have any further obligations hereunder.

**SECTION 7. CASUALTY INSURANCE.**

7.1 During the Lease term, Lessee shall maintain in full force and effect a policy or policies of insurance covering the Building and the Premises, that shall provide coverage against such risks as are commonly covered under a "special form/all-risk" policy (including earthquake and/or flood coverage, at Lessor's election), together with loss of rents and secondary liability insurance. Such insurance shall contain such policy limits and deductibles, shall be obtained through such insurance company or companies, and shall be in such form as Lessor reasonably deems appropriate, and shall provide coverage for one hundred percent (100%) of the replacement value of the Building. All insurance proceeds payable under the casualty insurance carried hereunder shall be payable solely to Lessor, and Lessee shall have no interest therein. Lessee shall deliver to Lessor certificates of insurance showing the insurance required to be maintained pursuant to this Section within thirty (30) days of the Commencement Date and upon request of Lessor thereafter.

**SECTION 8. UTILITIES AND SERVICES.**

8.1 General. Lessee shall pay all charges for electricity, water, gas, telephone and other utility services furnished to the Premises during the Lease term and for all inspections, governmental fees and other like charges associated therewith. Lessor makes no representation or warranty whatsoever as to the types, quantities, availability or costs of any and all utility services for the Building and the Premises.

Lessee shall comply with all Laws concerning the use or reduction of use of utilities in the Premises. Unless caused by the sole, active negligence of Lessor, interruption of any service or utility shall not render Lessor liable to Lessee for damages, relieve Lessee from performance of Lessee's obligations under this Lease or be deemed an eviction or disturbance of Lessee's use and possession of the Premises. Lessee shall install surge protection systems for power provided to the Premises, and Lessee releases Lessor from all liability for any damage caused by any electrical surge.

**SECTION 9. SURRENDER; HOLDOVER.**

9.1 Surrender. Lessee and those claiming by, through or under Lessee, shall, at any time prior to the expiration of the Term or prior termination thereof, then or within ten (10) days thereafter, remove all personal property, trade fixtures and any equipment installed by Lessee from the Building and the Premises, provided that if such removal causes any damage to the Premises, Lessee shall promptly repair the same. Upon expiration or earlier termination of this Lease, Lessee shall surrender the Premises and the Building swept and free of debris, with carpeted areas vacuumed and in good and serviceable condition, subject to ordinary wear and tear. Lessee shall remove any conduits, wiring, cables or alterations installed by Lessee and shall repair all damage to the Premises and the Building resulting from that removal. If Lessee fails to remove any such personal property or alterations, including conduits, wiring, cable or alterations, those items shall be deemed abandoned, and Lessor may remove or dispose of such items without liability to Lessee or others, and Lessee shall reimburse Lessor for the cost of such removal and storage thereof upon demand.

9.2 Holdover. If Lessee fails to surrender the Premises and remove all its personal property as set forth herein, Lessor may either: (i) recognize Lessee as a month-to-month Lessee at sufferance and such tenancy shall be subject to all terms of this Lease, except that Rent shall be one hundred fifty percent (150%) of the total Rent for the last month being charged and all options or other rights regarding extension of the term or expansion of the Premises shall automatically terminate; or (ii) evict Lessee from the Premises and recover all damages resulting from Lessee's wrongful holdover.

**SECTION 10. ASSIGNMENT AND SUBLETTING.**

Lessee may assign its rights under this Lease or sublet any part of the Premises to any of its subsidiaries or other affiliates with equal or greater financial net worth to that of Lessee as of the Commencement Date from time to time or to any person who acquires all or substantially all of Lessee's assets in the State of Oregon and Washington. Except as set forth above, Lessee shall not assign or encumber its interest under this Lease or sublet all or any portion of the Premises without having first provided thirty (30) days' written notice to Lessor and thereafter obtained Lessor's written consent. Lessee shall deliver written notice of Lessee's desire to assign or sublet all or any portion of the Premises and such notice shall include a recent audited financial statement and a statement of the intended use for such proposed assignee or sublessee. So long as any proposed sublessee or assignee is (i) compatible with Lessor's regular credit and use standards for the Premises and (ii) maintains an audited net worth equal to or greater than that of Lessee as of the Commencement Date, Lessor's consent shall not be unreasonably withheld, conditioned or delayed. No assignment shall relieve Lessee of its obligation to pay Rent or perform other obligations required by this Lease, and no consent to one assignment or subletting shall be a consent to any further assignment or subletting.

**SECTION 11. DESTRUCTION BY CASUALTY.**

11.1 Major Damage. In case of Major Damage to the Building, Lessor or Lessee may elect to terminate this Lease by notice in writing to the other party within thirty (30) days after such date. "Major Damage" shall mean damage to the Building by fire or other casualty (i) that

causes more than twenty-five percent (25%) of the Building to be unusable, or (ii) the repair of which will cost more than twenty-five percent (25%) of the replacement value of the Building (iii) or that is not required under this Lease to be covered by insurance. If neither Lessor nor Lessee terminates this Lease after any Major Damage, or if damage occurs to the Building that is not Major Damage, and subject to receipt by Lessor of sufficient insurance proceeds to perform such repairs, Lessor shall restore the Building to the condition existing immediately prior to such damage, and this Lease shall continue in full force and effect. In the event of any damage to the Building by fire or other casualty, Lessee shall promptly repair and restore all Lessee improvements or alterations installed or paid for by Lessee or pay the cost of such restoration to Lessor if Lessor performs such restoration. In the event the Building is damaged by any casualty, Rent shall be reduced in proportion to the unusable portion of the Building from the date of damage until the date restoration work to the Building is substantially complete.

**SECTION 12. INDEMNITY BY LESSEE.**

12.1 Lessee shall indemnify, defend and hold harmless Lessor from and against any liabilities, injuries, claims, losses or damages arising from (a) any damage to any person or property occurring in, on or about the Premises during the Term unless caused by the gross negligence or willful misconduct of Lessor, its employees, contractors or agents, (b) the use by Lessee or its agents, invitees or contractors of the Premises, and/or (c) Lessee's breach or violation of any term of this Lease. Prior to taking possession of the Premises, Lessee shall provide Lessor with written certificate proof of insurance, or its self insurance, regarding its liability hereunder with respect to its equipment, employees and activities on the Premises.

**SECTION 13. EMINENT DOMAIN.**

13.1 If any portion of the Building or a substantial portion of the Premises shall be permanently taken under any right of eminent domain, or any transfer in lieu thereof (the "Taking") and such taking renders the Premises in the reasonable opinion of Lessee unsuitable for Lessee's use, then either party may terminate this Lease by giving thirty (30) days' prior written notice to the other party, and such termination shall be effective on the date possession of the Building, Premises or portion of either is delivered to the condemning authority. If this Lease is not so terminated, Lessor shall repair and restore the Premises as close as practicable to its condition prior to the Taking, and this Lease shall continue, but, commencing with the date on which Lessee is deprived of the use of any portion of the Premises or of any rights under this Lease, Base Rent shall be proportionately abated or reduced, based on the extent to which Lessee's use of the Premises is impaired. Any and all awards payable by the condemning authority in connection with a Taking shall be the sole property of Lessor.

**SECTION 14. COVENANT OF QUIET ENJOYMENT.**

14.1 Lessor covenants that upon Lessee's payment of all Rent herein reserved and performing and observing all the terms and other covenants to be performed and observed on the part of Lessee, Lessee may use and occupy the Premises throughout the full term of this Lease without any disturbance by any person claiming by or through Lessor.

**SECTION 15. ALTERATIONS; SIGNS.**

15.1 Alterations by Lessee. Lessee shall not make any alterations, additions, or improvements to the Premises (i) for which any governmental permit is required; or (ii) that modify any structural, mechanical, electrical or plumbing component of the Building or (iii) that cost more than $10,000, without first having obtained Lessor's prior written consent, which consent Lessor shall not unreasonably withheld, condition or delay. If Lessor consents in writing to any proposed alteration of the Premises, Lessee shall (A) obtain all necessary governmental permits and approvals and deliver copies thereof to Lessor, and (B) cause all alterations to be completed promptly in compliance with Lessor-approved plans and specifications with all due diligence in a good and workmanlike manner. Except for removable machinery and unattached movable trade fixtures, all improvements, alterations, wiring, cables or conduit installed by Lessee shall immediately become part of the Premises, with title vested in Lessor. Lessor may require that Lessee remove any such improvements, alterations, wiring, cables or conduit installed by or for Lessee and restore the Premises to good condition and repair upon expiration or earlier termination of this Lease. Any contractor used by Lessee for any work in the Premises shall be subject to review and reasonable approval by Lessor, and Lessor may post notices of nonresponsibility in connection with any work being performed in the Premises by or at the request of Lessee. All work in the Premises by or at Lessee's request must comply with all applicable Laws. Lessee shall not permit any liens to attach to the Building or Lessee's interest in the Premises as a result of any work performed by or at Lessee's request.

15.2 Signs. Lessee may erect signs identifying Lessee's business after the date of this Lease, provided that Lessee obtains any approval for such sign required by the municipality in which the Premises are located and any other governmental entity with jurisdiction of the Premises.

15.3 Upon termination or expiration of this Lease, Lessee shall remove all signs and sign hardware at Lessee's sole cost and expense and Lessee shall restore the sign location to its former state. Should Lessee fail to remove signs and restore the sign locations, Lessor may do so and Lessee shall reimburse Lessor for the actual expense incurred by Lessor plus an administrative fee of 15% of such cost upon written demand of Lessor to Lessee.

**SECTION 16. DEFAULT.**

16.1 Events of Default. Each of the following shall be an Event of Default by Lessee under this Lease:

16.1.1 Failure by Lessee to pay Rent, Taxes or Insurance or any other charge due under this Lease within ten (10) days after notice by Lessor to Lessee that the same is overdue.

16.1.2 Failure by Lessee to comply with any other obligation of this Lease within twenty (20) days following written notice from Lessor specifying the failure (except in the case of emergency, in which event Lessor shall only be required to give such notice as is reasonable under the circumstances); provided, however, that if the nature of Lessee's default requires more than twenty (20) days to correct, Lessee shall not be deemed in default of this Lease so long as Lessee commences the cure of such failure within such twenty (20)-day period and thereafter,

proceeds in good faith and with all diligence to complete such cure as soon as possible but in no event later than ninety (90) days after the date of Lessor's notice of default.

16.1.3 Lessee's abandonment of the Premises or failure by Lessee to occupy the Premises within twenty (20) days after notice from Lessor.

16.1.4 Assignment or subletting by Lessee in violation of Section 10.

16.1.5 Lessee's failure to execute and deliver to Lessor the documents described in Section 30 within ten (10) days of written notice from Lessor.

16.1.6 Lessee's insolvency, business failure or assignment for the benefit of its creditors. Lessee's commencement of proceedings under any provision of any bankruptcy or insolvency law or failure to obtain dismissal of any petition filed against it under such laws within the time required to answer; or the appointment of a receiver for all or any portion of Lessee's properties or financial records.

16.2 Remedies for Default. Upon the occurrence of an Event of Default described in Section 16.1, Lessor may exercise the following remedies as well as any other remedies at law or in equity, by statute or as set forth in this Lease:

16.2.1 Lessor may terminate this Lease, reserving all rights to damages resulting from Lessee's breach. Whether or not Lessor terminates this Lease, Lessor may retake possession of the Premises and any relet or use of the Premises by Lessor shall not be deemed a surrender or waiver of Lessor's right to damages. If Lessor retakes possession of the Premises, Lessor's mitigation efforts shall be deemed sufficient if Lessor follows commercially reasonable procedures and otherwise complies with Law.

16.2.2 Lessee shall be liable to Lessor for all damages caused by Lessee's default, including, but not limited to, an amount equal to all unpaid and future Rent, Lease commissions incurred for this Lease, and the unamortized cost of all improvements to the Premises installed or paid for by Lessor. Lessor may periodically sue Lessee to recover damages as they accrue, and no action therefore shall bar a later action for damages accruing thereafter. Lessor may elect in any one action to recover both accrued damages as well as damages attributable to the remaining term of the Lease. Any damages attributable to the remaining term of the Lease shall be equal to the difference between the Rent under this Lease and reasonable rental value of the Premises (including Additional Rent) for the remainder of the term, discounted at the prevailing interest rate on judgments to the date of the judgment.

16.3 Lessor's Right To Cure Default. Lessor may, but shall not be obligated to, make any payment or perform any obligation under this Lease that Lessee has failed to perform, as and when required hereunder. Lessee shall pay Lessor for all expenditures and costs incurred by Lessor in performing any obligation of Lessee and an administrative charge of 15% of such expenditures and costs, upon demand, with interest thereon at the rate of one and one-half percent (1½%) per month, or the highest rate allowed by Law, whichever is less. Lessor's right to cure any Lessee default is for the sole protection of Lessor and in no event shall Lessee be released from any obligation to perform all of Lessee's obligations and covenants under this Lease. The contents of this Section shall not be deemed a waiver by Lessor of any other right

that Lessor may have arising from any default of this Lease by Lessee, whether or not Lessor exercises its rights under this Section.

16.4 Lessor's Default. Lessor shall not be deemed to be in default of the performance of any obligation required to be performed by it hereunder unless and until Lessor fails to perform such obligation within thirty (30) days after written notice by Lessee to Lessor specifying the nature of Lessor's alleged default; provided, however, that if the nature of Lessor's alleged default is such that more than thirty (30) days are required for its cure, then Lessor shall not be deemed to be in default if Lessor shall commence such performance within such thirty (30)-day period and thereafter diligently prosecute the same to completion.

16.5 The parties hereto agree that if at any time a dispute should arise as to the propriety or necessity of Lessee making any payment or performing any obligations required hereunder, Lessee may pay or perform the same under protest and such payment or performance under protest shall not be considered to be voluntary on the part of Lessee.

## SECTION 17. ASSENTS.

17.1 No assent, express or implied, by one party to any breach of any covenant or condition herein contained on the part of the other to be performed or observed, and no waiver, express or implied, of, or failure by one party to insist on the other's prompt performance or observance of, any such covenant or condition shall be deemed to be a waiver of or assent to any succeeding breach of the same, or any other covenant or condition, and, except as provided herein, any party may assert its rights and remedies hereunder without any prior or additional notice to the other that it proposes to do so. The payment by Lessee and acceptance by Lessor of rent or other payment hereunder or silence by either party as to any breach shall not be construed as waiving any of such party's rights hereunder unless such waiver is in writing.

## SECTION 18. CUMULATIVE RIGHTS.

18.1 Any and all rights and remedies which either party may have hereunder shall be cumulative and the exercise of any one of such rights shall not bar the exercise of any other right or remedy which said party may have.

## SECTION 19. NOTICES.

19.1 Whenever in this Lease notice, demand or other communication is to be given or served by either party to this Lease to or upon the other, such notice shall be deemed to have been duly delivered, given or served if in writing and when sent by overnight air courier, personal delivery or mailed by certified or registered mail, return receipt requested, postage prepaid, addressed to the party to whom it is to be given or served in the case of Lessor at its address shown at the beginning of this Lease or at the most recent place to which rental checks were mailed and in the case of Lessee at c/o United Site Services, Inc., 200 Friberg Parkway, Suite 4000, Westboro, MA 01581, Attention: Terry Bellora, President. Each party may change its above address for purposes of notices by notice to the other party in the manner hereinabove provided. If any communication is given by mail, it will be effective upon the earlier of (a) forty-eight (48) hours after deposit in the U.S. mail, with postage prepaid, or (b) actual

receipt, as indicated by the return receipt; and if given by personal delivery or by overnight air courier, when delivered.

**SECTION 20. WAIVER OF SUBROGATION.**

20.1 Neither Lessor nor Lessee shall have any claim against the other or the employees, officers, directors, managers, agents, shareholders, partners or other owners of the other for any loss, damage or injury which is required to be covered by insurance in accordance with this Lease by such party or for such party's benefit, notwithstanding the negligence of either party in causing the loss. The foregoing waiver and release shall not apply, however, to any damage caused by intentionally wrongful actions or omissions of either party.

**SECTION 21. ENTIRE AGREEMENT.**

21.1 This Lease contains the entire and exclusive agreement between the parties with respect to the lease of the Premises and supersedes all prior or contemporaneous arrangements, understandings and agreements, whether oral or written. This Lease may not be amended or modified, except by a writing executed by Lessor and Lessee.

**SECTION 22. GOVERNING LAW AND SEVERABILITY.**

22.1 This Lease shall be governed by and interpreted in accordance with the laws of the State of Oregon. If any provision of this Lease shall be determined to be invalid or unenforceable under applicable law, such provision shall, insofar as possible, be construed or applied in such manner as will permit enforcement; otherwise, this Lease shall be construed as if such provision had never been made a part hereof.

**SECTION 23. ATTORNEY'S FEES.**

23.1 In case suit shall be brought to enforce any provisions of this Lease, the prevailing party shall (in addition to other relief granted) be awarded all reasonable attorney's fees and costs resulting from such litigation. Disputes between the parties which are to be litigated shall be tried before a judge without a jury and by initialing below, Lessor and Lessee hereby expressly waive any right to require that any dispute under this Lease be heard before a jury.

| ______________ | ______________ |
| --- | --- |
| Lessor | Lessee |

**SECTION 24. HEADINGS.**

24.1 The headings used herein are used only for convenience of reference and are not to be considered a part of this Lease or to be used in determining the intent of the parties hereto.

**SECTION 25. BINDING EFFECT.**

25.1 This Lease shall be binding upon and inure to the benefit of all successors and permitted assigns, including all permitted sub-Lessees, of the parties hereto.

**SECTION 26. LEASEHOLD TITLE INSURANCE; NONDISTURBANCE.**

26.1 Lessor and Lessee shall execute a Memorandum of Lease, and Lessor shall execute affidavits regarding mechanics liens (except for any such liens that arise through actions or omissions of Lessee) and parties in possession in form and content reasonably satisfactory to Lessor, and take such other actions, as may be reasonably requested by Lessee to enable Lessee to obtain a leasehold title insurance policy on the Premises. Without further documentation, this Lease shall be subject and subordinate to any deeds of trust, mortgages, ground lease, master lease or land sale contracts and any amendment or modification thereof, now existing or hereafter recorded against the Premises (collectively, the "Encumbrances"). Lessee shall execute all documents reasonably requested by Lessor or the holder of an Encumbrance to confirm such subordination; provided, however, that this Lease shall only be subordinate to any future Encumbrance, or modification thereof, if the holder of that Encumbrance executes a non-disturbance agreement by which the holder of such Encumbrance recognizes Lessee's rights under this Lease unless Lessee is in default beyond any applicable cure period. Lessor shall also use commercially reasonable efforts to obtain a nondisturbance agreement from any mortgagee of any part of the Premises from time to time, providing that so long as Lessee observes the terms of this Lease, Lessee's possession will not be disturbed following any foreclosure of the mortgage.

**SECTION 27. LESSOR ACCESS.**

After reasonable notice to Lessee, Lessor may enter upon the Premises with its passkey or other reasonable means to assess compliance with this Lease, perform required or necessary services, maintenance, repairs, alterations or services to the Building or the Premises, show the Premises to potential buyers of the Premises and post appropriate notices, and during the last three months of the Lease Term, show the Premises to any potential future lessee. Except in case of emergency, all entry to the Premises shall be at times and in a manner so as to minimize interference with Lessee's use of the Premises.

**SECTION 28. CONVEYANCE BY LESSOR**

If the Premises is sold or otherwise conveyed by Lessor or any successor, including by foreclosure of any encumbrance, so long as Lessee is not in default beyond any applicable cure period, Lessor shall cause such successor to recognize Lessee's rights hereunder, and Lessee shall attorn to the buyer or transferee and recognize that party as Lessor under this Lease. If the buyer or transferee assumes all obligations of Lessor under this Lease accruing thereafter, Lessor shall be deemed released of all further liability to Lessee under this Lease.

**SECTION 29. ESTOPPEL.**

At any time and from time to time upon not less than twenty (20) day's prior notice from either party, the other party will execute, acknowledge and deliver to the requesting party a certificate certifying whether or not this Lease is in full force and effect and unmodified, if there are any modifications, that the Lease is in full force and effect as modified; that Lessee is in possession of the Premises; the dates to which Rent has been paid in advance and the amount of prepaid Rent; and such other matters as may be reasonably requested. If either party fails to

deliver a requested certificate within the specified time, such failure shall conclusively establish that the party from whom the certificate was requested confirms that the Lease is in full force and effect, without modification except as may be represented by the requesting party. The parties agree that any such certificate may be relied upon by any existing or prospective holder of an Encumbrance or any prospective transferee of this Lease or the Premises.

**SECTION 30. FORCE MAJEURE.**

If the performance by either party of any provision of this Lease is prevented or delayed by any strikes, lockouts, labor disputes, acts of God, government actions, civil commotions, fire or other casualty, or other causes beyond the reasonable control of the party from whom performance is required, such party shall be excused from such performance (but excluding any required payment of money) for the period of time equal to the time of that prevention or delay.

**SECTION 31. BROKERS.**

Each party represents that neither party has had any dealings with any real estate broker, finder or other person with respect to this Lease. Lessor and Lessee each agrees to indemnify and hold the other party harmless from and against any and all costs, expenses or liability for commissions or other compensation or charges claimed by or awarded to any broker or agent resulting from a breach of the representation set forth above in this Section 31.

**SECTION 32. LIMITATION ON LIABILITY.**

Notwithstanding anything to the contrary in this Lease, except for the sole active negligence of Lessor, Lessee hereby releases Lessor, its agents and employees from (i) damage to Lessee's property, (ii) damage arising out of the acts, including criminal acts, of third parties, (iii) consequential damages, and (iv) any damage, cause or matter that exceeds the value of Lessor's interest in the Premises.

**SECTION 33. TIME OF THE ESSENCE AND HOLIDAYS.**

Time is of the essence of each and every provision hereof. If the final date of any period of time set forth herein occurs on a Saturday, Sunday or legal holiday, then in such event, the expiration of such period of time shall be postponed to the next day which is not a Saturday, Sunday or legal holiday.

**SECTION 34. SUCCESSORS.**

This Lease shall bind and inure to the benefit of the parties, their respective heirs, successors, and permitted assigns.

[Signature page follows]

IN WITNESS WHEREOF, the parties have hereto set their hands and seals effective as of October 1, 2007.

In the presence of:

Lessor:

Blue Office, LLC

_______________________________

By: ___________________________

Its

Lessee:

United Site Services of Nevada, Inc.

_______________________________

By: ___________________________

Its: President and CEO

IN WITNESS WHEREOF, the parties have hereto set their hands and seals effective as of ____________________, 2007.

In the presence of:

Lessor:

Blue Office, LLC

Anne Barragan

By: ____________________

Its Member

Lessee:

United Site Services of Nevada, Inc.

____________________

By: ____________________

Its

# EXHIBIT A

## IN THE COUNTY OF CLACKAMAS AND STATE OF OREGON

A part of Section 11, Township 2 South, Range 2 East, of the W.M., more particularly described as follows:

Beginning at a point 32 links East and 6.95 chains South and 12 feet East of the one-quarter section post between Sections 10 and 11, Township 2 South, Range 2 East of the W.M.; thence from said beginning point East 146.5 feet; thence South 200 feet; thence West 146.5 feet; thence North 200 feet to the place of beginning.

TOGETHER with and subject to a non-exclusive easement for ingress, egress, and utility purposes over and under the strip of land in the Southwest one-quarter of Section 11, Township 2 South, Range 2 East, W.M., described as follows:

BEGINNING at the Northeast corner of a tract conveyed to Gustav Haberlach by Deed recorded in Book 67 at Page 255, which corner is described as 32 links East and 6.95 chains South of the one-quarter corner of the West line of said section; thence South along the East line of said tract to the center line of Foster Road; thence East along said centerline, 12 feet; thence North parallel with the East line of said Haberlach Tract, 438.9 feet, more or less, to the South line of a tract conveyed to Haberlach by Deed recorded in Book 81 at Page 438; thence West 12 feet to the point of beginning.

SUBJECT TO the statutory powers, including the power of assessment, of Clackamas County Service District No. 1.

SUBJECT TO the statutory powers, including the power of assessment, of Clackamas Water District.

SUBJECT TO the rights of the public in and to that portion lying within streets, roads and highways.

SUBJECT TO mortgage, including the terms and provisions thereof, executed by Patrick Joseph Downey and Joan Ann Downey, husband and wife, to State of Oregon, represented and acting by the Director of Veterans' Affairs, pursuant to ORS 407.030, dated December 17, 1973, recorded December 17, 1973, Fee No. 73 38590, given to secure the payment of a note for $19,500.00.

SUBJECT TO easement, including the terms and provisions thereof, for ingress, egress and utility purposes, 12 feet in width, from K. G. Bakke and J. A. Elting, to Merle E. Phillips, Jessie M. Phillips, doing business as Phillips Sanitary Service, dated November 22, 1974, recorded February 23, 1976, Fee No. 76 5619.

SUBJECT TO mortgage, including the terms and provisions thereof, executed by Patrick Joseph Downey and Joan Ann Downey, Husband and Wife, to the State of Oregon, represented and acting by the Director of Veterans' Affairs, pursuant to ORS 407.030, dated May 6, 1981, recorded May 8, 1981, Fee No. 81 15969, given to secure the payment of a note for $21,800.00.

# EXHIBIT B-2 TO OBJECTION

## FIFTH AMENDMENT TO LEASES

# FIFTH AMENDMENT TO LEASES

**THIS FIFTH AMENDMENT TO LEASES** (this "**Amendment**") is made as of June 30, 2022 (the "Effective Date") between **OMJ, LLC** ("**Lessor**") and **UNITED SITE SERVICES OF NEVADA, INC.**, a Nevada corporation ("**Lessee**").

## RECITALS

A. Lessor, as successor-in-interest to CP SAN, LLC, WHITE SHOP, LLC, RED SHOP, LLC, and BLUE OFFICE, LLC, and Lessee are parties to a series of leases for certain real property and structures thereon located as follows (each, a "**Lease**" and collectively the "**Leases**"):

a. Lease dated May 8, 2008, as amended by Amendment to Lease dated March 22, 2012, Amendment No. 2 dated April 24, 2012, Third Amendment to Lease dated May 30, 2012, and Fourth Amendment to Lease dated April , 2018, for 12209 SE Highway 212, Clackamas, Oregon (the "**CP San Lease**").
b. Lease dated October 1, 2007, as amended by Amendment to Lease dated March 22, 2012, Amendment No. 2 dated April 24, 2012, Third Amendment to Lease dated May 30, 2012, and Fourth Amendment dated April , 2018, for 12249 SE Hwy 212, Clackamas, Oregon (the "**White Shop Lease**").
c. Lease dated October 1, 2007, as amended by Amendment to Lease dated March 22, 2012, Amendment No. 2 dated April 24, 2012, Third Amendment to Lease dated May 30, 2012, and Fourth Amendment dated April , 2018, for 12275 SE Hwy 212, Clackamas, Oregon 97015 (the "**Red Shop Lease**").
d. Lease dated October 1, 2007, as amended by Amendment to Lease dated March 22, 2012, Amendment No. 2 dated April 24, 2012, Third Amendment to Lease dated May 30, 2012, and Fourth Amendment dated April , 2018, for 12211 SE Highway 212, Clackamas, Oregon (the "**Blue Office Lease**").

B. The Leases are set to expire on September 30, 2022.

C. The parties desire to extend the term of the Leases as set forth herein.

## AGREEMENT

**FOR VALUABLE CONSIDERATION**, the receipt and sufficiency of which are hereby acknowledged, Lessor and Lessee hereby agree as follows:

1. **Extension of Term**. The term of the Leases will be extended to March 31, 2024 (the "**Extended Term**").



RCP

2. **New Rental Rates**. The monthly Base Rent for the Extended Term will be as follows:

| Lease | Base Rent |
|---|---|
| Blue Office Lease | $10,000 |
| Red Shop Lease | $5,000 |
| White Shop Lease | $4,000 |
| CP San Lease | $4,000 |
| Total | $23,000 |

3. **No Option to Extend**. Lessee shall have no right to further extend the term of the Leases beyond the Extended Term.

4. **No Default**. Lessee acknowledges and agrees that there are no breaches or defaults under the Leases on the part of Lessor, nor does any condition exist that, with the passage of time or the giving of notice or both, would constitute such a breach or default on the part of Lessor under the Leases, nor does Lessee have any rights or claims of offset against Lessor.

5. **As-Is; Waivers**. Lessee reaffirms its acceptance of the Premises "as-is, where-is". Nothing herein shall constitute an assent, express or implied, or waiver, by Lessor, to any breach of any covenant or condition contained in the Lease, known or unknown.

6. **Cross Default.** A new Section 6.1.7 is added to the Leases to read as follows:

   "16.1.7 An event of default occurs under any present or future obligation of any kind owed by Lessee to Lessor, including but not limited to any lease between Lessee and Lessor."

7. **Document Preparation Fee.** Lessee shall pay to Lessor a fee for document preparation in the amount of $2,000 by July 15, 2022.

8. **Incorporation; No Offer**. The terms and conditions of this Amendment are hereby incorporated in and made a part of the Leases, which remain in full force and effect subject to the amendments made hereunder. In the event of any conflict between the terms of the Leases and those of this Amendment, the terms of this Amendment shall prevail. The submission of this Amendment to Lessee shall not be construed as an offer, and Lessee shall not have any rights under this Amendment unless Lessor executes a copy of this Amendment and delivers it to Lessee.

9. **Counterparts**. This Amendment may be executed simultaneously or in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.



RCP

**IN WITNESS WHEREOF**, Lessor and Lessee have executed this Amendment as of the date first set forth above.

**LESSOR:**

**OMJ, LLC,**
an Oregon limited liability company

By: Roger C. Porter
Name: Rogers Clifton Porter
Title: Manager

**LESSEE:**

**UNITED SITE SERVICES OF NEVADA, INC.,**
a Nevada corporation

By: ______________________
Name: Scott Jamroz
Title: ~~President and CEO~~ CFO



RCP

# EXHIBIT C TO OBJECTION

## ALLEGED GOOGLE AI TRANSCRIPT RECEIVED FROM OMJ

USS / OMJ Critical need of maintaining Gravel in Parking Lots on a continuous basis

Per Ai Google

Maintaining a gravel parking lot for heavy trucks is **extremely important**, as heavy use quickly creates hazards like deep ruts, potholes, mud, and dust, leading to safety issues (accidents, allergies) and liability for the owner; regular grading, adding new gravel, and ensuring proper drainage are crucial to keep it functional, safe, and presentable, preventing costly major repairs later. Without maintenance, the surface degrades rapidly, becoming unusable and damaging vehicles.

## Why Maintenance is Critical for Heavy Truck Lots:

- **Safety Hazards**: Heavy trucks displace gravel, creating large ruts, potholes, and uneven surfaces, which are dangerous for vehicles and pedestrians, increasing liability.
- **Material Loss**: Gravel gets pushed out to the edges, breaks down into dust, or washes away, thinning the surface and exposing the base.
- **Dust & Pollution**: Constant truck traffic pulverizes gravel into fine dust, creating air quality issues and sticking to vehicles.
- **Drainage Problems**: Ruts and unevenness trap water, leading to mudholes and erosion.
- **Cost Escalation**: Neglect turns small issues into big problems, making eventual repairs far more expensive than routine upkeep.

## Essential Maintenance Tasks:

- **Regular Grading & Reshaping:** Use a grader or tractor to pull gravel from the edges back to the center, smoothing out ruts and potholes.
- **Adding New Gravel**: Replenish lost material annually or as needed to maintain depth.
- **Drainage Solutions**: Ensure proper grading for water runoff and consider French drains if water pools.
- **Weed Control**: Apply weed killer to prevent vegetation from taking root in bare spots.

## For Heavy Truck Traffic:

- **Use Proper Mix:** A well-packed gravel mix (like AB3) is best for heavy loads.
- **Consider Pavers:** For very high traffic, permeable pavers can stabilize the area better than loose gravel.

In summary, consistent maintenance isn't just about looks; it's vital for safety, functionality, and cost-effectiveness when dealing with heavy truck traffic on a gravel lot.

USS / OMJ. Annual Maintenance of Metal Roofs on Building

Question put to Ai on Google on 1-12-26

Q...how important is annual maintenance to a metal roof on a building

A...Annual maintenance for a metal roof is **highly important**, not because metal roofs fail often, but to prevent small issues like debris buildup, loose fasteners, or minor scratches from escalating into costly leaks, corrosion, or premature roof failure, ensuring the roof reaches its 50+ year lifespan and maintaining warranties. It's a small investment (often just inspections and cleaning) that protects your significant investment and maximizes its performance and durability, saving thousands in potential repairs and replacements.

## Key Reasons for Annual Maintenance

- **Prevents Costly Damage**: Early detection of debris (leaves, dirt) preventing corrosion, or loose fasteners preventing leaks saves major structural repairs, notes this YouTube video and AskARoofer.com.
- **Maximizes Lifespan**: A well-maintained metal roof can last 50-70+ years, but neglecting it shortens this significantly, meaning you'll need a costly replacement sooner, say Sheffield Metals and Universal Roofing & Exteriors.
- **Protects Warranty**: Many manufacturers require periodic professional inspections to keep your warranty valid.
- **Maintains Aesthetics & Energy Efficiency**: Cleaning keeps it looking good, and a clean roof reflects heat better, reducing cooling costs.

## What Maintenance Involves (Typically Annual)

- **Inspection**: Check for loose panels, sealants, fasteners, and any signs of rust or wear.
- **Cleaning**: Clear gutters and roof of debris like leaves, twigs, and dirt.
- **Minor Repairs**: Tighten fasteners, address small scratches, or reseal flashing if needed.

In essence, annual checks turn a long-lasting, low-maintenance roof into a truly "set-and-forget" system for decades, protecting your building from weather and time.

USS / OMJ Destroyed Wood Canopy between 40ft Storage Containers

Question put to Ai on Google on 1-12-26

Q...How much would a professional contractor charge in Portland Oregon to build a custom-built wood frame structure that is a 40 ft deep roof with a 25-ft clear span between two shipping containers including a fully framed and finish wood back wall plus interior lights and a couple power outlets with a level gravel floor

A....For a custom 40ft deep, 25ft clear span wood-framed roof structure between shipping containers in Portland, expect costs potentially ranging from **$15,000 to $40,000+**, heavily depending on material quality (lumber/roofing), labor rates (Oregon's are rising), complexity (trusses/beams for the span), finishes (full wall/electrical), site prep (gravel base/container leveling), permits, and contractor overhead, with framing labor alone potentially $20+/sq ft in complex builds, but a precise quote needs detailed plans for local pros.

## Key Cost Factors & Estimates

- **Size & Framing:** Roughly 1000 sq ft (40ft x 25ft). Framing costs in Oregon can run $7-$21+ per sq ft (labor/materials), so $7,000 - $21,000+ just for basic framing, but more for complex designs.
- **Clear Span (25ft):** Requires substantial beams (steel or engineered wood), adding significant cost over standard framing.
- **Roof:** A simple shed roof is cheaper; complex pitches/trusses add thousands.
- **Back Wall:** A fully finished wood wall (drywall, paint, trim) adds $18-$30+/linear foot for framing/finish, plus wall material costs.
- **Electrical:** Basic interior lights and outlets add $500 - $1,500+ depending on complexity and permits.
- **Gravel Floor:** Basic gravel pad (excavation, fabric, gravel) could be $500 - $2,000+, site prep is crucial.

- **Shipping Containers:** Assume you have these, but placement/leveling adds cost.

## Rough Breakdown (Example)

- **Site/Base:** $1,000 - $2,000
- **Structural Beams (for 25ft span):** $2,000 - $5,000 (depending on material)
- **Framing (Walls, Roof Structure):** $7,000 - $15,000+ (includes labor/lumber, higher for complexity)
- **Roofing (Simple Metal/Shingles):** $2,000 - $4,000
- **Wood Back Wall (Framed/Finished):** $2,000 - $4,000
- **Electrical:** $1,000 - $2,000
- **Permits & Contractor Overhead (15-25%):** $3,000 - $10,000+

**Total Estimate: $18,000 - $40,000+**, emphasizing that detailed plans are vital for an accurate bid from local Portland contractors.

USS / OMJ ASPHALT DRIVEWAY REPAIR

Question put to Ai on google on 1-11-26

Q...In Portland Oregon what is a reasonable estimate for a asphalt driveway 28 ft by 90 ft that is going to be used for heavy truck driving on a daily basis

A...In 2026, a reasonable estimate for a heavy-duty asphalt driveway measuring 28 ft by 90 ft (2,520 sq. ft.) in Portland, Oregon, ranges from **$17,600 to $37,800**.

While standard residential projects typically range from $7 to $15 per square foot, your requirement for daily heavy truck use necessitates commercial-grade thickness and a reinforced base, pushing costs toward the higher end of the spectrum ($12 to $15+ per sq. ft.).

## Estimated Cost Breakdown

- **Total Square Footage:** 2,520 sq. ft.
- **Standard Project Range:** $17,640 – $32,760 (based on $7–$13/sq. ft. for new installation).
- **Heavy-Duty Adjustment:** For daily heavy truck traffic, contractors typically recommend a thicker asphalt layer (4–6 inches instead of the standard 2–3 inches) and a more robust sub-base. This can increase costs to **$30,000 – $38,000**.

## Critical Cost Factors for Heavy Use

- **Asphalt Thickness:** Standard driveways use roughly 2–3 inches of asphalt. Heavy trucks require 4–6 inches to prevent rutting and structural failure, which significantly increases material costs ($100–$200 per ton).
- **Base Preparation:** A heavy-duty driveway requires a deeper, compacted gravel sub-base (often 8–12 inches) to support the weight of daily truck loads without shifting.
- **Permit Fees:** In Portland, you must account for local permitting, which typically ranges from $50 to $200 depending on the specific municipality.
- **Site Preparation:** Costs will increase if your site requires extensive excavation or grading to ensure proper drainage, which is vital for maintaining the integrity of a high-traffic surface.

## Maintenance Requirements

Because of the heavy daily load, regular maintenance is essential to prevent premature deterioration:

- **Sealcoating:** Plan to seal the surface every 3–5 years at an estimated cost of **$1.50 per square foot** ($3,780 for this size) to protect against water penetration and oil spills.
- **Curing Time:** For heavy vehicles, contractors may advise keeping trucks off the new surface for at least **3–7 days** to allow for proper initial hardening.

USS / OMJ Cost Estimate to replace lost Design, Construction Photos and Operational Manuals for Industrial Wastewater Disposal Facility

Question put to Ai on Google 1-12-26

Q.... What kind of cost would be estimated to replace design and operational manuals used to run and repair an existing industrial Wastewater receiving plant that involves tanks, pumps, electronic controls with a current estimated system replacement of over $500,000

A.... The estimated cost to recreate comprehensive design and operational manuals for an existing industrial wastewater receiving plant can range from **tens of thousands of dollars to over a hundred thousand dollars**, depending on the complexity of the system and the level of detail required. This is a significant expense, separate from the system's half-million dollar replacement value.

## Key Factors Influencing Cost

The cost is primarily driven by the extensive engineering labor required to reverse-engineer and document an existing, undocumented system.

- **Engineering Labor:** The main expense will be the hours spent by consulting engineers and technicians on-site. Engineering consulting rates typically range from **$75 to $250 per hour**.
- **Documentation Scope:** The specific documents needed, such as Process & Instrumentation Diagrams (P&IDs), electrical schematics, operational procedures, maintenance schedules, and safety protocols, all require dedicated time to create or verify against the physical installation.
- **System Complexity:** More complex systems involving advanced automation, multiple treatment stages, and various chemical processes will require more detailed documentation and thus higher costs.

- **On-site Assessment:** A thorough, physical inspection of all existing components (tanks, pumps, controls, piping, instrumentation) is necessary to ensure accuracy, which adds to the labor costs.
- **Automation and Controls:** Documenting specialized electronic control systems (PLC programming, HMI configurations, network architecture) can be a significant portion of the cost and may require specialized expertise.
- **Regulatory Requirements:** Strict compliance and reporting standards for industrial wastewater can increase the required detail and rigor of the documentation, further driving up costs.

## Cost Comparison

While specific cost figures for documentation alone are not publicly standardized like construction costs, the expense is generally viewed as a substantial investment in capital recovery and operational efficiency. For comparison, basic process control system services can range widely from $1,000 for simple tasks up to hundreds of thousands for complex projects.

Given the $500,000 replacement value of the plant, investing 10-20% of that value (or more) in professional, detailed documentation is a reasonable planning estimate to ensure reliable and compliant long-term operations.